ORDERED.

**Dated: August 18, 2017**

K. Rodney May
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re

Amit Bhalla,

Debtor.

Case No. 8:16-bk-00265-KRM
Chapter 7

China Central Television, China International Communications Co., Ltd., TVB Holdings (USA), Inc., and DISH Network, LLC,

Plaintiffs,

v.

Amit Bhalla,

Defendant.

Adv. No. 8:16-ap-285-KRM

**MEMORANDUM OPINION AND ORDER**
**GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs ask for summary judgment, on Counts I and II of their Complaint, to obtain an award of damages against Debtor for copyright and trademark infringement and a determination that such damages are excepted from discharge under 11 U.S.C. § 523(a)(6).[1] Their principal

[1] Unless otherwise stated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*.

contention is that Debtor, through a wholly-owned company, sold electronic devices with free software that enabled customers to view Plaintiffs' television channels and protected programs without charge. After considering the motion, Debtor's response, and Plaintiffs' reply, and the affidavits and exhibits proffered by the parties, the Court concludes that judgment is due to be entered for Plaintiffs Central Television ("CCTV"), China International Communications Co., Ltd. ("CICC"), TVB Holdings (USA), Inc. ("TVB USA"), and DISH Network LLC ("DISH").[2]

**UNDISPUTED FACTS**

Plaintiffs' Copyrights and Trademarks

CCTV and TVB (the parent of TVB USA) are said to be the largest broadcasters of Chinese language television in mainland China and Hong Kong. They are the owners of exclusive rights to Chinese language television programs.[3] Certain CCTV television channels and programs originally broadcast in mainland China are also distributed in the United States by Plaintiff DISH in a bundle called the "Great Wall Package."[4] At all relevant times, CCTV and TVB USA owned the trademarks and copyrights at issue.[5]

[2] The Court heard argument on the Motion for Summary Judgment on May 16, 2017, but reserved ruling until after the parties had submitted supplemental memoranda, including Debtor's outline of any alleged genuine issues of disputed fact. *See* Memorandum and Response at Doc. Nos. 66 and 67.

[3] TVB operated five television channels, called Jade, J2, Jade HD, iNews and Pearl, and 13 pay-TV channels in Hong Kong. It granted TVB USA the exclusive right transmit and distribute its programs in the United States.

[4] In the United States, TVB USA distributes TVB programs through license agreements with certain cable television systems and satellite television services, including DISH. DISH has the exclusive right to retransmit CCTV's Great Wall Package in United States via satellite. DISH also has a non-exclusive right to distribute the Great Wall Package over the internet in United States.

[5] Plaintiff CICC is a wholly owned direct subsidiary of CCTV. CICC is authorized to use the CCTV trademarks and service marks in connection with distributing CCTV programming in the United States.

Debtor and Asha Media

In July of 2013, Debtor purchased Asha Media Group, Inc. ("Asha Media").[6] He was its sole owner, officer and director.[7] Asha Media's revenues – and Debtor's income − were derived solely from the sales of an electronic device called "TVpad," which purchasers could use, among other things, to acquire Plaintiffs' television programming from the internet.[8] Asha Media sold TVpads through its website, "TVpad.com."[9] With the addition of certain software to the TVpad, purchasers could acquire and view Plaintiffs' television programs from China and other Asian countries free of charge.[10]

In the two years after Debtor's purchase, 8,123 TVpads were sold, producing about $2,145,234 in total revenues. Debtor was compensated by disbursements of Asha Media's revenues, in such amounts and at such times as he decided.[11]

Customers in the United States could purchase a TVpad through TVpad.com for $259 (TVpad3) and $329 (TVpad4).[12] The TVpad was marketed for its ability to acquire Plaintiffs' copyrighted programming. For example, the TVpad.com website advertised:

- *"Not wanting to pay for streaming television? TVpad4 still streams . . . CCTV and many, many more."*[13]

---

[6] Bhalla Dep. at 54:17-22.

[7] *Id.* at 21:17-22:13.

[8] *Id.* at 69:8-12.

[9] Debtor operated the TVpad.com website. *Id.* at 27:9-28:12.

[10] Plaintiffs' understanding of Debtor's business was obtained, in part, from an investigator, Ms. Shuk Kuen "Lily" Lau, retained in 2014. Ms. Lau's declaration is in the record. *See* Lau Dec. at ¶ 30.

[11] Bhalla Dep. at 26:5-27:8.

[12] Lau Dec. at ¶ 24.

[13] *Id.* at ¶ 28a (quoting a December 18, 2014 blog post on TVpad.com).

- *"Viewers will also have access to CCTV which is broadcast directly from the People's Republic of China."*[14]
- The TVpad devices provide *"complete access to CCTV."*[15]

Asha Media promoted sales by specifying that Plaintiffs' television channels were available through the TVpad, through postings on its website and through communications with customers.[16] These postings included replicas of Plaintiffs' trademarked logos.[17]

Asha Media also identified the software applications ("apps") that could be used to obtain Plaintiffs' television channels and programs. To entice customers to buy from Asha Media, the TVpads were offered with a USB drive, pre-loaded with the apps that enabled customers to access and view Plaintiffs' television programming without any fees or charges.[18]

Between June 2014 and December 2015, Debtor and Asha Media referred customers to the TVpad manufacturer, who advised them that using the TVpad was "legal."[19] Customers'

---

[14] Lau Dec. at ¶ 28c (quoting a June 30, 2014 blog post on TVpad.com).

[15] *Id.* at ¶ 28e (quoting a December 8, 2014 blog post on TVpad.com).

[16] A blog on the TVpad.com website promotes the TVpad device and its ability to provide free access to Chinese television programing. The blog also encourages TVpad customers to use infringing apps to view CCTV and TVB programs. *See*, *e.g.*, Lau Dec. at ¶ 28a-e.

[17] Bhalla Dep. at 181:10-24, 183:18-184:18 and Dep. Exs. 32-33.

[18] According to the Debtor: *"We provided apps via USB drive as a courtesy for the customers so they didn't have to log into the TVPad store and download each app. We were doing this via a promotion, where they get a free USB drive with every purchase. This enticed customers to buy the TVPad, versus other people selling TVPad."* Bhalla Dep. at 181:1-9. Many of the TVpad's most popular and heavily promoted apps permitted the retransmission of CCTV and TVB programming from Asia to TVpad users in the United States. TVpad apps had the capability of streaming live television programming by means of a peer-to-peer network, through which TVpad users received the television programs and simultaneously retransmitted those programs to other TVpad users. This peer-to-peer network was advertised on the TVpad.com website. Lau Dec. at ¶ 27.

[19] Examples of the customer support emails are in the record at Doc. No. 47. The representative, Abby Zhou, also held herself out as a customer service representative for Asha Media. She emailed Asha Media's customers using a TVpad.com email address. Ms. Zhou handled all customer communications. Notifications of all emails were sent directly to Debtor. *See* Bhalla Dep. at 181:16-183:14; Lau Dec. at ¶ 34.

queries were answered via email by a customer service representative for the TVpad distributor.[20] Debtor testified that he was notified about each of these email exchanges.[21]

In 2014, Debtor engaged an advertising agency, SEO Chicago Style ("SEO"), for search-engine optimization and website building. In a July 23, 2014 email to SEO, Debtor stated: "*As mentioned earlier we cannot publish any content regarding Channels as the TVpad doesn't own any of the content licenses. However - If you can create a PDF document with pictures for this so we can send our customers this information via email that would be helpful. Just don't post it on the blog.*"[22] In August of 2014, SEO confirmed that they had a plan to create a "secondary informational website to be able to list channels, possibly use secondary site to capture people into retargeting and direct sales to tvpad.com [and] link to yourself from secondary site, but include other resellers to *obfuscate Amit's* [Debtor's] *involvement.*"[23]

At times, Debtor used the pseudonym "Charles Franco" when sending emails to customers.[24] In an email to Plaintiffs' investigator, Debtor (as Charles Franco) attached a channel listing featuring Plaintiffs' television channels, images of their trademarks, and advertisement of the apps needed to access Plaintiffs' programming for free.[25] With Debtor's knowledge and, at times direct participation, customers were told such things as:

- *"TVB channels of tvpad4 is legal, no worries!"* Email from Abby Zhou (Customer Support Agent) to William Lau, January 4, 2015 at 8:46 am.

[20] Bhalla Dep. at 24:5-7; 183:11-14.

[21] *Id.* at 181:22-182:4.

[22] Doc. No. 46 at 4.

[23] Referring to the Debtor, Amit Bhalla. *Id.* at 6 (emphasis added).

[24] *See* Lau Dec. at ¶ 32; Bhalla Dep. at 24:10-12, 181:19-21.

[25] Lau Dec. at ¶ 32.

- *"Tvpad3 could watch tvb channels, it is no legal issue."* Email from Abby Zhou (Customer Support Agent) to Connie Wong, July 15, 2014 at 5:59 am.

- *"You will do not get any legal action when you use tvpad3. We sent a 8GB usb driver to you as a gift. It was pre-installed latest apps. Pls put it into tvpad3. Connect the USB driver into your Tvpad3 device."* Email from Abby Zhou (Customer Support Agent) to Junghwan Yoon, July 19, 2014 at 10:59 am.

- *"We will ship a 8gb usb driver to you as a gift, it was pre-installed all apps for live channels, you could use the usb driver to install the apps directly."* Email from Abby Zhou (Customer Support Agent) to Lynn Tam-Toy, November 15, 2014 at 11:12 am.

- *"The TVpad itself doesn't violate any copyright laws as the device doesn't stream any channels. The content is streamed via 3rd party apps which are developed by other companies. If there are copyright issues, then those app owners are liable and the manufacturer does their best to make sure they are compliant."* Email from ***Charles Franco*** to Jaime Vega, June 11, 2014 at 10:10 pm.

- *"The TVpad device itself is 100% legal as it does not stream any of it's (sic) own content however the content is streamed from 3rd party apps which is not related to the manufacturer or tvpad.com."* Email from ***Charles Franco*** to Chris Lee, June 10, 2014 at 10:09 pm.[26]

In June and October of 2014, Plaintiffs' investigator, Lily Lau, purchased two TVpads from Asha Media through direct interactions with Debtor.[27] Debtor confirmed to Ms. Lau that CCTV channels were available on the TVpad device.[28] He told her that TVpad.com would provide a USB flash drive pre-loaded with the necessary apps.[29] He also explained to Ms. Lau that the TVpad would not require monthly fees and could be used as long as the customer wants to use it.[30] Ms. Lau avers that Debtor himself promised that he would provide her with the

---

[26] Doc. No. 47.

[27] Lau Dec. at ¶¶ 31, 35.

[28] *Id.* at ¶ 30.

[29] *Id.*

[30] *Id.* at ¶ 34.

Chinese television channel listings. He later sent the channel listings to her.[31] These lists included the CCTV and TVB channels that could be accessed through the TVpad; the lists also identified the TVpad apps that would offer access to those channels.[32] Ms. Lau received two TVpads with USB flash drives containing infringing TVpad apps and software to help load those apps onto the TVpads.[33]

On December 19, 2014, Debtor sent an email to SEO directing the removal of the Plaintiffs' channels from the TVpad.com website because of a recent lawsuit against TVpad's manufacturer: "*Please ask Charlie to remove any channel mentioning on all the blog posts. .* (sic) *The manufacturer got hit with a lawsuit recently and we need to support them as much as possible. No mentioning of channels . . . anywhere.*"[34]

Plaintiffs' Federal Court Case

On November 21, and again on December 19, 2014, Plaintiff DISH sent letters to Debtor and Asha Media demanding that they stop inducing the infringement of Plaintiffs' copyrighted television programming (the "Cease and Desist Letters"). The Cease and Desist Letters identified the infringing TVpad apps and provided a list of specific CCTV and TVB channels, as well as 145 individual CCTV and TVB programs, that were being streamed through the TVpad device without authorization.

In his deposition, Debtor admitted to reading the Cease and Desist Letters.[35] In January 2015, Debtor retained counsel, Traverse Legal, PLC, known to have intellectual property

[31] Lau Dec. at ¶¶ 30, 32.

[32] *Id.* at ¶ 32.

[33] Braak Dec. at ¶¶ 68-69, 72.

[34] Doc. No. 46 at 8.

[35] Bhalla Dep. at 65:15-66:7, 67:14-22.

expertise. A draft response was prepared on the firm's letterhead, disputing the allegations of copyright and trademark infringement. But, that letter was not signed and it was not sent to DISH or any of the Plaintiffs.[36] Debtor has admitted that TVpads were sold after he received the Cease and Desist Letters.[37]

In March of 2015, Plaintiffs filed a complaint in the United States District Court for the Central District of California (the "District Court Complaint") seeking damages against Asha Media and Debtor.[38] On June 11, 2015, the District Court entered a preliminary injunction barring Asha Media, Debtor and parties acting in active concert or participation with them, from: advertising and promoting infringing TVpad apps; distributing, advertising and promoting TVpad devices containing those or other infringing apps and otherwise infringing Plaintiffs' rights in their copyrighted programming.

It is alleged that Debtor, through Asha Media, continued to sell TVpads until June 15, 2015.[39] In his response to the Plaintiffs' Motion for Summary Judgment, Debtor states that "upon receipt [of the preliminary injunction], Asha immediately ceased all sales of the TVpad."[40] But, the outcome in this proceeding is not altered by any dispute whether sales continued for four days after the District Court entered its injunction.

Asha Media's sales records indicate that 8,123 TVpads were sold between 2013 and 2015 and that 4,036 TVpads were sold after November 21, 2014, the date of the first Cease and Desist

---

[36] *See* Doc. No. 63 at 23 (email from Traverse attorney sending updated version of the letter to Debtor on February 3, 2014 at 4:10 pm), and 26 (draft letter dated February 3, 2015).

[37] Bhalla Dep. at 67:8-13, 68:14-16.

[38] Debtor was served with that District Court Complaint. Doc. No. 1, Ex. 1.

[39] Wukoson Dec. at ¶ 8, Ex. 2.

[40] Doc. No. 59 at ¶ 13. But, exhibits show a sales transaction dating as late as June 15, 2015. Wukoson Dec. Ex. 2.

Letter.[41] These sales records also indicate that Asha Media sold 2,737 TVpads after December 19, 2014, the date of the second Cease and Desist Letter.[42]

On November 7, 2016, the District Court entered a default judgment against Asha Media for $6,885,000 of copyright statutory damages and $2,145,000 of lost profits from trademark infringement, for a total judgment of $9,030,000. The judgment included findings that Asha Media had willfully infringed Plaintiffs' copyrights and was as culpable as the TVpad's manufacturer (also held liable in a default judgment).[43] The District Court also found that Asha Media was "actually aware" of its infringing activity after receiving the Cease and Desist Letters on November 20, 2014 and December 19, 2014.[44]

Debtor's Bankruptcy Case

Debtor filed a Chapter 7 petition, on January 13, 2016 (the "Main Bankruptcy Case"). Plaintiffs then filed this adversary proceeding, on April 18, 2016, asserting that by 11 U.S.C. § 523(a)(6), Debtor's liability to Plaintiffs for damages and lost profits for copyright and trademark infringement cannot be discharged.

## ANALYSIS

Plaintiffs assert that Debtor, as the sole controlling person of Asha Media, willfully and maliciously injured Plaintiffs by encouraging and promoting his customers' infringement of their copyrights and trademarks. Plaintiffs assert that their claims arising from the infringements are non-dischargeable pursuant to § 523(a)(6).

---

[41] Wukoson Dec. at ¶¶ 5-7, Ex. 2.

[42] *Id.* at ¶ 7, Ex. 2.

[43] Default Judgment and Permanent Injunction dated November 16, 2016, Doc. No. 42-1; Amended Order Granting Plaintiffs' Motion for Default Judgment, Doc. No. 41.

[44] *Id.*

Debtor does not contest the facts summarized above. Instead, he argues that he understood that his business was legitimate, based on representations in 2013 by the seller of Asha Media. Debtor argues that he was merely one of many sellers of TVpad devices, which also included several big name retailers and internet distributors, such as Sears, Amazon, Ebay, and others. Debtor asserts that he had no control over the apps or their functions. Essentially, Debtor argues that there is a genuine issue of material fact about whether he knew or intended to infringe Plaintiffs' protected rights. Debtor also argues that upon receipt of Cease and Desist Letters from Plaintiffs, he solicited the advice of intellectual property counsel, who presented a legal argument supporting sales of TVpads.[45]

1. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that no genuine issue of material fact exists, and that it is entitled to judgment as a matter of law."[46] "The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. A "genuine" dispute means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[47]

Once the moving party has met its burden, the non-movant must set forth specific facts showing there is a genuine issue for trial.[48] A party opposing summary judgment "may not rely merely on allegations or denials in its own pleading."[49] Rather, the nonmoving party must, by affidavits or as otherwise provided in Rule 56, "set forth specific facts showing a genuine issue

[45] Doc. No. 59.

[46] Fed. R. Civ. P. 56(a) is made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7056.

[47] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

[48] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 10 S. Ct. 1348 (1986).

[49] *Liberty Lobby*, 477 U.S. at 249-51.

for trial."[50] The factual conflicts relied on by the non-moving party must be both genuine and material.[51] A properly supported summary judgment motion will not be defeated by merely colorable evidence that is not significantly probative.[52]

In determining entitlement to summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."[53] The non-moving party is given the benefit of the doubt on credibility issues and all justifiable inferences are to be drawn in favor of the non-moving party.[54]

In addition, the Court may draw inferences, make findings of fact, and make determinations of witness credibility.[55] Likewise, "[i]t is permissible for a trial court in a non-jury case to grant summary judgment if witness credibility is not at issue and trial would not enhance the court's ability to draw inferences and conclusions."[56]

---

[50] *Liberty Lobby*, 477 U.S. at 249-51.

[51] *Official Comm. of Unsecured Creditors v. Lerner (In re Diagnostic Instrument Group, Inc.)*, 283 B.R. 87, 94 (Bankr. M.D. Fla. 2002) (*citing Mulvihill v. Top-Flite Golf Co*., 335 F.3d 15, 19 (1st Cir. 2003)).

[52] *Dalton v. FMA Enterprises, Inc.*, 953 F. Supp. 1525, 1528 (M.D. Fla. 1997).

[53] *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

[54] *In re Diagnostic Instrument Group, Inc.*, 283 B.R. at 94.

[55] *In re French*, 2012 WL 1166248, *4-5 (M.D. Fla. Apr. 9, 2012); *Nunez v. Superior Oil Co*., 572 F.2d 1119, 1124 (5th Cir. 1978).

[56] *In re French*, 2012 WL 1166248, at *4. As the Fifth Circuit explained in *Nunez v. Superior Oil Company*:

> "If a decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though the decision may depend upon inferences to be drawn from what has been incontrovertibly proved. Under those circumstances, which may be rare, the judge who is also the trier of fact may be warranted in [drawing a conclusion] even if that conclusion is deemed 'factual' or involves a 'mixed question of fact and law.' A trial on the merits would reveal no additional data . . . . The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial."

2. Debtor's Direct Conduct and his Operation of Asha Media and the Website Caused a Willful and Malicious Injury to Plaintiffs

Plaintiffs must show, by a preponderance of evidence, that their claim arose from a "willful and malicious injury by the debtor . . . ."[57] Both requirements must be proven.[58]

In considering the requirement of "willfulness," the Supreme Court, in *Kawaauhau v. Geiger*,[59] rejected the argument that reckless or negligent conduct, as alleged in that case for a medical malpractice claim, was sufficient for the § 523(a)(6) exception to discharge:

> "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described 'willful acts that cause injury.' Or, Congress might have selected an additional word or words, *i.e.*, 'reckless' or 'negligent,' to modify 'injury.' Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'"[60]

Thus, injuries that arise from accident, inadvertence, negligence or recklessness are not considered "willful" for the § 523(a)(6) exception to discharge.[61] The injury itself must be

---

572 F.2d 1119, 1124 (5th Cir. 1978) (which is precedent in the Eleventh Circuit after *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

57 11 U.S.C. § 523(a)(6). *Grogan v. Garner*, 498 U.S. 279 (1991).

58 *See, e.g., In re Levin*, 434 B.R. 910, 917 (Bankr. S.D. Fla. 2010) and *In re Weiner*, 415 B.R. 900, 905 (Bankr. S.D. Fla. 2009) ("An injury alleged as the basis for a non-dischargeable claim under 11 U.S.C. § 523(a)(6) must be both willful and malicious.").

59 523 U.S. 57 (1998).

60 *Id.* at 61-62 (emphasis in the original).

61 *In re Vestal*, 256 B.R. 326, 328-29 (Bankr. M.D. Fla. 2000).

intentional or deliberate; but, an intentional act may be considered to be the cause of a "willful" injury if it is substantially certain to cause the injury.[62]

In addressing copyright infringement claims under § 523(a)(6), this Court finds helpful Judge Hyman's analysis in *Symantec Corporation v. Cristina*:

> "When the injury alleged is copyright infringement, a plaintiff must show that the debtor intentionally infringed the plaintiff's copyright. *Focusing on the debtor's intent to perform an act—the infringement—is appropriate in this context because unlike other contexts in which a debtor's intentional act may or may not cause injury, intentional copyright infringement does not have 'uncertain or variable outcomes.'* In other words, intentional infringement of a copyright or trademark is 'tantamount to intentional injury under bankruptcy law' because 'it is impossible to separate the 'conduct' of trademark infringement from the 'injury' of trademark infringement when considering the defendant's intent.' Furthermore, a debtor who intentionally infringes a copyright 'is charged with the knowledge of the natural consequences of his actions[,]' such as the harm that will result from the infringement. *Thus, a debtor who intentionally infringes a copyright is charged with the knowledge that injury to the copyright holder is sure, or substantially certain, to result.*"[63]

Applying the foregoing principles, the Court finds that Debtor engaged in deliberated acts which were substantially certain to injure Plaintiffs:

1. Debtor had concerns about infringement in 2013 and knew that the TVpad manufacturer did not have any "content licenses;"[64] but, he only sought assurances from the seller. He took no steps to verify these assurances, or the lawful scope of his business.

2. Debtor personally communicated with customers to assure them, even though he had no objective basis for doing so, that they could legally obtain free access to Plaintiffs' television channels and protected content. He emailed lists of Plaintiffs' channels to them which included Plaintiffs' trademarks.

3. Debtor did more than sell electronic boxes; he actively promoted use of the TVpad as a means of viewing Plaintiffs' protected content in his communications with

---

[62] *See Kane v. Stewart Tilghman Fox & Bianchi, P.A. (In re Kane)*, 755 F.3d 1285, 1293 (11th Cir. 2015); *Thomas v. Lovelass (In re Thomas)*, 288 Fed. Appx. 547, 549 (11th Cir. 2008).

[63] *Symantec Corp. v. Cristina* (*In re Cristina)*, 2011 WL 766966, *4 (Bankr. S.D. Fla. Feb. 24, 2011)(internal citations omitted) (emphasis added).

[64] Doc. No. 46 at 4 (Email from Amit Bhalla to SEO, July 23, 2014 at 9:39 pm).

customers and through his TVpad.com website. He provided lists of Plaintiffs' channels to promote his sales of TVpads.

4. Debtor knowingly directed his customers to use the infringing apps. He provided them with USB flash drives containing the infringing apps to facilitate their free acquisition of Plaintiffs' protected programming.

5. He offered customers, in emails using the Charles Franco pseudonym, with an explanation of the legality of using the TVpads to access Plaintiffs' programming, without having any objective basis for such opinion.

6. Debtor attempted to diminish the appearance of his personal involvement by altering the website/blog and using the "Charles Franco" pseudonym.

7. He personally directed his customers' infringing conduct.

8. Debtor continued selling TVpads after receipt of the Cease and Desist Letters.

9. By his deliberated actions, Debtor encouraged customers to use TVpads to infringe Plaintiffs' rights and he directed them on how to do it.

These acts were substantially certain to injure Plaintiffs and are, therefore, willful for purposes of § 523(a)(6).

Debtor does not proffer any evidence to establish that a genuine issue of material fact exists that he intentionally directed his customers to acquire Plaintiffs' television channels for free by buying TVpads bundled with the infringing apps. Debtor controlled the TVpad store, which promoted and offered the apps principally to acquire TVB's channels. He also caused Asha Media to provide TVpad customers with USB drives that were pre-loaded with the infringing apps. Debtor advertised the "one-time" cost of the TVpad versus monthly channel subscriptions through licensed providers. He knew, or reasonably should have known, that his customers' use of the TVpad, with the infringing apps that he provided, would deprive Plaintiffs of monthly subscription and licensing profits. Debtor did not cease distributing the TVpads with apps until June of 2015, seven months after receiving the first Cease and Desist Letter.

Debtor's alleged reliance on the IP attorneys' unfinished opinion letter is without merit. That draft was not an objective opinion letter.[65] The draft letter was prepared after more than two years of infringing conduct. There is no proof in the record that the Traverse firm ever put their reputation behind the opinion that Debtor's conduct was not infringing. In any event, reliance on the advice of counsel is not a defense to § 523(a)(6).[66]

An injury is "malicious" under § 523(a)(6) when it is caused by conduct that is "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will."[67] A showing of specific intent to harm another is not necessary and "[m]alice can be implied."[68] In cases under §523(a)(6) involving conversion of collateral, or financial injury, courts have

---

[65] *See also Applera Corp. v. MJ Research Inc.*, 372 F. Supp. 2d 233, 239 (D. Conn. 2005) ("[T]he documents fail to demonstrate that defendants relied in good faith on the advice of counsel. The Strenio letter is not a traditional opinion letter containing objective legal and factual analysis, but rather than advocacy letter . . . As Strenio's representation of defendants was aimed at a particular results . . . it does not satisfy the requirements of a good faith legal opinion.")

[66] *In re Sarff*, 242 B.R. 620, 629 (B.A.P. 6th Cir. 2000). "If Congress had intended to provide debtors with an affirmative defense based on the advice of their attorneys it could have so expressly legislated." Id.

[67] *In re Kane*, 755 F.3d at 1294.

[68] *Id.*

required proof of a debtor's knowledge or consciousness of wrongdoing.[69] Some courts have required proof that the wrongful conduct was targeted at the creditor.[70]

Intentional copyright or trademark infringement does not have uncertain or variable outcomes. It always results in harm. Thus, one who intentionally infringes protected copyrights and trademarks knows that injury to the holder is substantially certain to result.[71]

As described above, Debtor's conduct – the sale of TVpads by the deliberate promotion of their use to infringe Plaintiffs' rights – was wrongful and without just cause. He knew, or should have known, that Plaintiffs were losing revenues because of this activity. Moreover, Debtor's actions to remove channel listings from the website, his use of a pseudonym, and his solicitation of advice from SEO as to how to reduce the appearance of his own involvement, demonstrate that Debtor was conscious at all times of the risks inherent to this business. Because the Debtor directed and facilitated others' infringement of Plaintiffs' copyrights and trademarks, the Court finds that his conduct was malicious, as well as willful, as required by § 523(a)(6).

---

[69] *See, e.g., In re Kane,* 755 F.3d at 1295 (affirmed the bankruptcy court's finding of malice, by implication, where the debtor attorneys' had secretly released their clients' bad faith claims against an insurer, even though they knew that other law firms (creditors) had been engaged, on a contingent fee basis, to prosecute the same bad faith claims and were negotiating with the insurer to settle them at a higher amount); *In re Stanley,* 66 F.3d 664, 668 (4th Cir. 1995) (court found malice requirement was satisfied where debtor knew increase in line of credit from $8,000 to $80,000 was a mistake, but used the whole line of credit despite knowledge of the mistake); *In re Esfahani,* 2010 WL 3959607 (Bankr. M.D. Fla. Sept. 22, 2010) (court found cause of action for willful and malicious injury existed where debtor knowingly collected rent from tenants and used the money collected for his own purposes instead of making mortgage payments because the debtor knew that his actions would result in injury to the plaintiffs.); *In re Cardillo,* 39 B.R. 548, 550 (Bankr. D. Mass. 1984) (court found that debtor committed a willful and malicious injury when he traded vehicle securing bank's loan for another vehicle to be co-owned with his sister without consent of the Bank or notification to the bank because he knew of the bank's security interest and had knowledge that Bank's lien needed to be satisfied).

[70] *See, e.g., In re Caruth*, 2002 WL 1770523 (Bankr. N.D. Iowa July 30, 2002) (holding that malicious conduct as to an injury to property under §523(a)(6) must be targeted at the creditor and finding none where debtor sold collateral and used the proceeds to pay bills).

[71] *See Nguyen v. Biondo (In re Biondo)*, 2014 WL 2702891, at *7 (Bankr. S.D. Fla. June 13, 2014) (entering summary judgment in favor of plaintiff on its 523 claim based upon its previously litigated infringement claims); *In re Cristina*, 2011 WL 766966, at *4.

3. Plaintiffs' Damages

Plaintiffs seek a judgment of $9,030,000 for Debtor's copyright and trademark infringement, consisting of $6,885,000 of copyright statutory damages and $2,145,000 of lost profits from trademark infringement.[72] In the Motion for Summary Judgment, Plaintiffs also seek a permanent injunction against Debtor and an award of reasonable attorneys' fees and costs.[73]

Statutory Damages

Plaintiffs have brought claims against Debtor for secondary copyright infringement under theories of both contributory infringement and vicarious liability.[74] For both theories of liability, a plaintiff "must establish that there has been direct infringement by third parties."[75] To establish copyright infringement, a plaintiff must prove: (1) ownership of a valid copyright, and (2) copying of protectable elements.[76]

It is not disputed that Plaintiffs hold U.S. copyright registrations for their television programs and own the exclusive rights to these programs. Debtor's sales of TVpads with the bundled apps encouraged and enabled TVpad users to stream and retransmit Plaintiffs' registered

---

[72] The same amount the District Court awarded against Asha Media by the default judgment.

[73] Such relief is not sought in either count of Plaintiffs' Complaint.

[74] "The Copyright Act does not expressly render anyone liable for infringement committed by another, but one infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwin-Mayer Studios Inc., v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).

[75] *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007); *Broad Music, Inc. v. Joint Bar & Grill, LLC*, 2012 WL 6933552, at *2 (S.D. Fla. Dec. 11, 2012).

[76] *Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*, 702 F.3d 1312, 1325 (11th Cir. 2012); *see also* 17 U.S.C. §501(a); *GlobalOptions Services, Inc. v. N. Am. Training Group, Inc.*, 131 F. Supp. 3d 1291, 1298 (M.D. Fla. 2015).

programs through a peer-to-peer network. When the TVpads were used by these customers, they were directly infringing Plaintiffs' exclusive rights under the Copyright Act.[77]

Plaintiffs must also prove, to prevail on their contributory copyright infringement claim, that Debtor (a) had knowledge of infringing activity; and (b) induced, caused, or materially contributed to direct infringement by others.[78] In turn, to establish a claim for inducement, a plaintiff must show that the defendant (1) engaged in purposeful conduct that encouraged copyright infringement, with (2) the intent to encourage such infringement.[79]

There is sufficient proof in this record that Debtor knew of the infringing activity. He intentionally induced, caused and materially contributed to that infringement by selling TVpads and promoting their use to view Plaintiffs' television programming free of charge. Debtor provided users with television channel listings including Plaintiffs' channels. He also provided users with pre-loaded USB drives containing apps designed to acquire Plaintiffs' programming.

To prevail on their vicarious infringement claim, Plaintiffs must establish that Debtor "profited from the infringement, and . . . had the right to stop or limit the infringement."[80] Here, Debtor wholly owned and controlled Asha Media and participated personally in the distribution of TVpads and the promotion of their use to view Plaintiffs' television channels and programming. Debtor could have, but chose not to, stop or limit the infringement by ceasing sales of TVpads by promoting their use for free acquisition of Plaintiffs' television programming

---

[77] *See ABC, Inc. v. Aereo, Inc.*, 134 S. Ct. 2498, 2506 (2014) ("[T]he concept of public performance . . . cover[s] not only the initial rendition or showing, but also any further acts by which that rendition or showing is transmitted or communicated to the public.")

[78] *Cable/Home Commc'n Corp.*, 902 F.2d 829, 845 (11th Cir. 1990); *Amazon.com*, 508 F.3d at 1171.

[79] *Ghostbed, Inc. v. Casper Sleep, Inc.*, 2016 WL 4145909, at *3 (S.D. Fla. July 19, 2016).

[80] *BWP Media USA Inc. v. S. Florida Chronicle, Inc.*, 2015 WL 11181967, at *3 (S.D. Fla. Apr. 20, 2015); *see also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261 (9th Cir. 1996).

and channels. Debtor profited from sales of TVpad devices with apps —whose purpose was to view Plaintiffs' television programming.[81]

The Copyright Act authorizes statutory damages of $750 to $30,000 per infringed work, and enhanced statutory damages of up to $150,000 per infringed work for willful infringement.[82] Statutory damages are available in copyright infringement suits because actual damages and lost profits "are often virtually impossible to prove."[83] Plaintiffs have proffered evidence that 459 episodes of Plaintiffs' copyrighted works were infringed before sales of TVpads were ceased in June of 2015.[84]

A court's consideration of the appropriate award of statutory damages is guided by factors "including the expenses saved and profits reaped by [the] infringer, revenues lost by copyright holder as a result of infringement and the infringer's state of mind, whether willful, knowing or innocent."[85] A court has wide discretion in setting the amount of statutory damages.[86] "[T]he purpose of statutory damages is to discourage wrongful conduct and enforce the statutory protections afforded by the Copyright Act."[87] The Eleventh Circuit has similarly stated that a court "may take into account the attitude and conduct of the parties" and "should

---

[81] Bhalla Dep. at 53:12-19.

[82] 17 U.S.C. § 504(c)(1)–(2).

[83] *Chi-Boy Music v. Charlie Club, Inc*., 930 F.2d 1224, 1229 (7th Cir. 1991).

[84] Doc. No. 39 at ¶ 89 (citing Braak Dec. at ¶¶ 74–75 (detailing infringed CCTV and TVB copyrighted programs) and Tsang Dec. at ¶¶ 24–26, Exs. 92–93 (identifying infringed TVB copyrighted programs).

[85] *Broad. Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 2013 WL 5487066, at *5 (M.D. Fla. Sept. 30, 2013).

[86] *Tiffany (NJ), LLC v. Dongping*, 2010 WL 4450451, at *6 (S.D. Fla. Oct. 29, 2010).

[87] *Broad. Music, Inc.*, 2013 WL 5487066, at *5.

consider both the willfulness of the defendant's conduct and the deterrent value of the sanction imposed."[88]

Here, Plaintiffs are requesting a total award of $6,885,000 in copyright statutory damages, based on $15,000 for each of the 459 episodes of infringing content. Debtor argues that $15,000 per work is not fair or reasonable; that statutory damages, if any, should be assessed at no more than $750 per episode, as permitted by 17 U.S.C. § 504(c) for innocent infringement.

In the case at hand, Debtor was not an "innocent" infringer. He knew that his enterprise was doing more than selling electronic boxes. He knowingly engaged in conduct that was substantially certain to injure Plaintiffs − by directing and facilitating customers' infringement of Plaintiffs' copyrights. For three years, Debtor and Asha Media deliberately marketed the availability of TVB and CCTV programming on the TVpad. Debtor knew that there was no license or agreement with Plaintiffs; he knew that customers would get their protected content without paying any fees. Debtor and Asha Media did not properly respond to the Cease and Desist Letters. Debtor caused the continued sale of TVpads with apps for seven months after it received the Cease and Desist Letters.

Debtor's willful and malicious conduct caused financial damage to Plaintiffs. It redirected revenues to Debtor by: (1) infringing sales – revenues that Debtor has garnered from sales of TVpads to Chinese-speaking consumers in the United States; (2) lost licensing revenue – licensing fees that Debtor otherwise would have had to pay (and Plaintiffs would have realized) to acquire the right to show TVB and CCTV channels; and (3) lost subscription revenue – fees that Plaintiffs would have realized if TVpad users instead had purchased CCTV and TVB television programming through DISH or other licensed providers. Due to the willful nature of

---

[88] *Cable/Home Commc'n Corp*., 902 F.2d at 852 (internal quotation marks omitted); *see also St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1205 (11th Cir. 2009).

Debtor's infringement, the Court finds that a minimal award of no more than $750 for "innocent infringement" is not warranted.

Nevertheless, in considering whether to allow punitive damages against a debtor as an exception to discharge, the Court must also consider that the overriding purpose of the Bankruptcy Code is to release a debtor from the burden of indebtedness and provide a debtor with a new opportunity in life, free from the pressures of pre-existing debt. Therefore, the provisions of the Bankruptcy Code providing for exception to discharge in § 523(a) may be applied to limit the punitive element of a nondischargeable claim.[89]

The Court views Plaintiffs' request for $15,000 per infringed work as excessive. Plaintiffs have provided some evidence, Asha Media's sales records, to establish that about $2.15 million in total revenues was derived from Debtor's infringing business. Therefore, in the exercise of its discretion, the Court will award Plaintiffs' statutory copyright damages of $5,000 for each of the 459 episodes of Plaintiffs' copyrighted works, for an award of $2,295,000.[90]

Trademark Infringement

"To prevail on a claim of trademark infringement in this case, plaintiffs must establish: (1) that they possess a valid mark, (2) that the defendants used the mark, (3) that the defendants' use of the mark occurred 'in commerce,' (4) that the defendants used the mark 'in connection with the sale . . . or advertising of any goods,' and (5) 'that the defendants used the mark in a manner likely to confuse consumers.'"[91]

---

[89] *See In re Gettings*, 130 B.R. 353, 355-56 (Bankr. M.D. Fla. 1991) (internal citations omitted) (awarding plaintiff $45,000 in punitive damages instead of the $80,000 requested).

[90] *See* Braak Dec. at ¶¶ 74-75; Tsang Dec. at ¶¶ 24-25, 27.

[91] *N. Am. Med. Corp. v. Axiom Worldwide, Inc*., 522 F.3d 1211, 1218 (11th Cir. 2008).

In assessing whether the marks employed by Debtor were likely to cause consumer confusion, in violation of Lanham Act, the Court has considered: (1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.[92] Furthermore, "a likelihood of confusion can be found as a matter of law if the defendant intended to derive benefit from the plaintiff's trademark."[93]

Debtor used exact copies of Plaintiffs' trademarks to advertise, promote and sell TVpads on TVpad.com.[94] Debtor stated to customers that CCTV and TVB programming was available on the TVpad device. Asha Media and Debtor also provided TVpad customers with listings of the CCTV and TVB channels with replicas of Plaintiffs' trademarks.[95]

Sales records indicate that over $2,145,234.22 in revenue was obtained by Debtor's business from sales of TVpads.[96] Therefore, Plaintiffs' assert that Debtor is liable for trademark infringement under the Lanham Act, as a matter of law, in that amount.[97] Debtor has not

---

[92] *See Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016).

[93] *See Babbit Elec., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1179 (11th Cir.1994).

[94] *See, e.g.,* Lau Dec. at ¶¶ 28(a)–(e), Ex. 82; Bhalla Dep. at 174:7-14; 184:3-24.

[95] Lau Dec. at ¶¶ 32-33 Exs. 89-90; Bhalla Dep. at 181:10-24, 183:18-184:18 and Dep. Exs. 32-33.

[96] Bhalla Dep. at 94:10-97:8, Ex. 17.

[97] Awarding this amount in addition to the copyright statutory damages requested above does not constitute a double recovery. When a defendant violates both the Copyright Act and the Lanham Act, an award of both types of damages is appropriate. *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994).The District Court awarded both copyright statutory damages and profits as a remedy for trademark infringement in the Default Judgment. Courts in this district and in the Eleventh Circuit have done the same. *See, e.g., In re Waszkiewicz*, 2009 WL 856344, at *2 (Bankr. M.D. Fla. Mar. 16, 2009); *Microsoft Corp. v. Silver Star Micro, Inc.*, No. 06-cv-1350, 2008 WL 115006, at *8 (N.D. Ga. Jan. 9, 2008); *Microsoft Corp. v. Moss*, 2007 WL 2782503, at *1 (N.D. Ga. Sept. 2, 2007).

provided any evidence regarding deductions from the gross revenues. The Debtor has had ample opportunity to provide some evidence regarding expenses – either through his response to Plaintiffs' motion for summary judgment, his supplement to his response, at the hearing, or in his supplemental filings.[98] But he has not done so.

A party opposing summary judgment "may not rely merely on allegations or denials in its own pleading."[99] Rather, the nonmoving party must, by affidavits or as otherwise provided in Rule 56, "set forth specific facts showing a genuine issue for trial."[100] Accordingly, the Court concludes that, in the absence of any specific facts regarding Debtor's profits versus gross revenue, Debtor is liable for trademark infringement under the Lanham Act as a matter of law in the amount of <u>$2,145,234.22.</u>

**<u>CONCLUSION</u>**

For the reasons stated above, the Court finds that the Debtor intentionally engaged in acts which were substantially certain to injure Plaintiffs without just cause. The undisputed facts demonstrate that Debtor knew that TVpads and the infringing apps would be used by his customers to gain free access to Plaintiffs' channels and protected programs. Debtor deliberately and intentionally promoted that use, by advertising the ability of customers to acquire such programing free of charge and even provided USB flash drives to facilitate such use. Debtor

---

[98] The Copyright Act (17 U.S.C. § 504(b)) provides that "the infringer is required to provide his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." The Lanham Act (15 U.S.C. § 1117(a)) provides that a plaintiff "shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." In his verified supplemental response to the Plaintiffs' motion for summary judgment, Debtor asserts that "because apps were required to view or interact with Plaintiff's (sic) intellectual property, any benefit from utilization of Plaintiff's (sic) intellectual property flowed directly only to TVpad manufacturers, app developers, or both, and to Asha and from Asha to Balla, at best, only secondarily and likely in a form even more attenuated." Doc. No. 62 at ¶ 19. However, Debtor provides no proof or affidavits to back up his allegations. The Debtor's affidavit is entirely silent on the issue of revenues versus profits. *See* Doc. No. 61.

[99] *Liberty Lobby*, 477 U.S. at 249-51.

[100] *Id*.

continued selling the TVpads and advertising the infringing apps after receiving the Cease and Desist Letters. Thus, the injury is willful and malicious as required for an exception to discharge under § 523(a)(6).

The Court concludes that $5,000 per violation is a reasonable measure of statutory copyright damages. Plaintiffs' request for $2,145,000 in profits from trademark infringement is also reasonable based on sales revenues and in the absence of any proffer by Debtor of evidence of deductions. Accordingly, Plaintiffs' Motion for Summary Judgment will be granted, in part. Plaintiffs' damages, in the amount of $4,440,234.22, are excepted from discharge under § 523(a)(6).

A separate judgment will be entered in the amount of $ 4,440,234.22 for statutory copyright damages of $2,295,000 and $2,145,234.22 for trademark damages. The Court will enter a permanent injunction as well.

Clerk's Office to serve.